# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>BOWERS INVESTMENT COMPANY, LLC,<br><br>Debtor. | Case No. F16-00136-GS<br>Chapter 11 |

## MEMORANDUM ON MOTIONS TO DISMISS OR CONVERT

Secured creditor Denali State Bank ("DSB"), has filed a Motion to Dismiss Chapter 11 Case, and the United States Trustee ("UST") has filed a separate Motion to Convert or Dismiss Chapter 11 Case. The debtor opposes both motions. For the reasons stated below, the court finds cause exists under 11 U.S.C. § 1112(b)(4)(A), (D) and (F) to convert this case to one under chapter 7.

## I.    CASE BACKGROUND.

The debtor has substantial assets comprised of several commercial buildings in Fairbanks, Alaska. It owns commercial buildings located at 2173 and 2175 University Avenue, 2333 Van Horn Road, and Lot 26, Section 17 ("Lot 26"), as well as a vacant lot known as Lot 56, Section 17, T1S-R1W.[1] The scheduled value of all its realty is $4,444,770.00. The debtor has rented the University and Van Horn properties to commercial tenants for a number of years at rates that have allowed it to timely pay the secured debts it owes to DSB and First National Bank Alaska ("FNBA").[2] The debtor currently leases Lot 26 to another entity, Yukon Maxi Storage, which is owned by the debtor's sole member and manager, Gerald Bowers.

---

[1] Schedule A/B, ECF No. 32 at 6.

[2] According to the debtor's Schedule D, DSB's loan is secured by the two University Avenue properties and Lot 26, while FNBA's loan is secured by the Van Horn Road property. *See* ECF No. 33.

The debtor's troubles arose last summer when it lost a major tenant, the University of Alaska, from one of its University Avenue locations. The debtor has been unable to replace this tenant, and has had insufficient income to service DSB's secured debt. It has not made a payment to DSB since October 2015. When its loan became delinquent, DSB commenced non-judicial foreclosure proceedings. DSB also opted to exercise its right to the assignment of rents as provided in its Deed of Trust.[3] On November 17, 2015, one day before DSB's scheduled foreclosure sale, the debtor filed a chapter 11 petition ("Bowers #1").[4] This proceeding had a brief, and rocky, life. Many of the issues that arose in that case were exacerbated by the total breakdown of the relationship between the debtor's counsel and its managing member, Mr. Bowers. The court dismissed Bowers #1 on April 18, 2016, for the debtor's failure to: (1) appear for a duly scheduled Rule 2004 examination, (2) timely file a plan and disclosure statement, and (3) comply with the requirements of an interim order for use of DSB's cash collateral.

Less than a month later, again facing foreclosure by DSB, the debtor filed the instant bankruptcy. Although represented by different counsel, who has more effectively dealt with Mr. Bowers, the debtor is repeating errors made in Bowers #1 in that it has failed to promptly seek authority to use DSB's cash collateral. This was a prominent issue in the prior bankruptcy. The debtor's counsel was advised by DSB, almost immediately after the filing of the instant case, that the bank would not consent to use of its cash collateral absent strict safeguards centered around

---

[3] DSB attached copies of its Promissory Note, Deed of Trust, Modification of Deed of Trust, and Business Loan Agreement to Proof of Claim 4-1, filed in *In re Bowers Investment Co., LLC*, Main Case No. F15-00395-GS. Although DSB has filed a proof of claim in the instant case as well, it only attached a printout of the loan payoff to that claim. The court takes judicial notice of both of DSB's proofs of claim, including the attachments to its original claim.

[4] *In re Bowers Investment Co., LLC*, Main Case No. F15-00395-GS ("Bowers #1).

the deposit of its cash collateral into an account with DSB.[5]  Further, during earlier hearings before this court, the debtor's counsel was admonished that he should familiarize himself with the record in Bowers #1 so that the mistakes made in that proceeding would not be repeated. Yet, the debtor did not file its Motion for Use of Cash Collateral and Release of Funds until June 21, 2016, more than six weeks after the petition was filed, and only in response to the dismissal motions.

In this proceeding, DSB has continued to exercise its rights to the assignment of rents. It is presently receiving rents from three tenants: the State of Alaska Department of Natural Resources, the United States Corps of Engineers, and the Small Business Administration. These monthly rents total $8,455.87.  Aaron Pletnikoff, DSB's chief lending officer, testified at the hearing that the bank was holding roughly $9,000.00 in the debtor's frozen DSB operating account.

The debtor's monthly rents from all sources total $20,683.73.[6]  Consequently, net of DSB's assignment of rents, the debtor should be receiving $12,227.86 in monthly rents.  The debtor has budgeted $15,174.50 in monthly operating expenses, excluding debt service to its secured creditors DSB and FNBA.  The debtor cannot satisfy its ongoing operating expenses absent the use of DSB's cash collateral.

---

[5] *See* Decl. of Aaron Pletnikoff, Attachment 1 (ECF No. 18-1).  The safeguards sought by DSB for use of its cash collateral appear to be reasonable.  DSB was willing to enter an interim cash collateral agreement of three months, with all of its rental income cash collateral to be deposited into a controlled account at the bank.  The debtor could submit invoices for services to the University Avenue properties and request draws to pay such invoices from the controlled account.  DSB would issue checks to pay the invoices, which the debtor would then deliver to the vendors who were being paid.  If the controlled account contained insufficient funds to pay any invoice, the debtor would be required to satisfy any shortfall.

[6] *See* Debtor's Mot. for Use of Cash Collateral, Ex. A (ECF No. 49).

The debtor's failure to deal with the cash collateral issues appears to stem from a deep distrust of DSB. The debtor believes DSB is considerably oversecured, and harbors resentment over DSB's exercise of its right to assignment of rents. DSB has collected rents directly from several tenants, and frozen the debtor's DSB operating account. There is also evidence that DSB seized, but then returned, some of Mr. Bowers' social security checks prior to the filing of the instant petition.[7] Much of the animosity comes from these actions, and the debtor's and Mr. Bowers' efforts to release such funds.

The debtor's schedules and statements were also late filed, after the UST and DSB filed their motions to dismiss. The failure to timely file these documents was, in fact, the impetus for the UST's motion to dismiss. Although the debtor has now "cured" the filing deficiencies noted in the UST's motion, it never sought an extension of time to file such documents. Nor has the debtor filed its initial monthly operating report, which was due June 15, 2016.

The debtor has filed a disclosure statement and plan of reorganization. However, its current counsel has now moved to withdraw from this case. At the evidentiary hearing on June 22, the debtor represented that it intended to retain attorney Robert Garrison, and sought permission to have Mr. Garrison speak on its behalf.[8] A nonconforming motion for permission to allow Mr. Garrison to appear pro hac vice had been filed prior to the hearing, but no application for substitution of counsel or employment of new DIP counsel was of record. Nor has such an application been filed as of the date of this order.

---

[7] *See* Debtor's Mot. for Use of Cash Collateral, Ex. C (ECF No. 51). Mr. Bowers is a guarantor of the DSB loans, and in 2015 the bank obtained a default judgment against him on this obligation.

[8] This request was denied because DSB and the UST objected to Mr. Garrison's participation at the hearing.

4

## II.    THE PENDING MOTIONS, AND DEBTOR'S RESPONSE.

DSB and the UST have filed separate motions to dismiss the chapter 11 case pursuant to 11 U.S.C. §1112(b).  DSB asserts three grounds for dismissal:  (1) the debtor filed the petition in bad faith; (2) the estate is operating at a substantial continuing loss, and there is no reasonable likelihood of rehabilitation; and (3) the debtor is continuing to use its cash collateral without authority.  The UST's motion also points to the debtor's unauthorized use of cash collateral.  It further argues dismissal is appropriate due to the debtor's unexcused failure to timely file its schedules and statements, under § 1112(b)(4)(F).  Unlike DSB, the UST's motion seeks the alternative remedy of conversion to chapter 7.

After these motions were filed, the debtor filed its Motion for Use of Cash Collateral as well as a Disclosure Statement.[9]  In its cash collateral motion, the debtor seeks permission to use tenant rents to pay the ongoing, necessary monthly operating expenses of its buildings.  It specifically requests that all rents, including those which are DSB's cash collateral, be deposited into its FNBA bank account.  The debtor further seeks an order requiring DSB to release $8,698.16 that is currently being held in its frozen operating account at DSB.  To date, the debtor has not noticed its motion to use cash collateral.

The debtor's proposed Disclosure Statement did not attach a plan of reorganization, nor was a plan filed contemporaneously with this document.  The debtor filed its chapter 11 plan one day after the evidentiary hearing.  It has not requested a hearing on the adequacy of its disclosure statement.

---

[9] The Disclosure Statement could be considered "early" filed.  At a status and scheduling conference held on June 6, 2016, the court decided it would not set a deadline to file a plan or disclosure statement until after the motions to dismiss were determined.

5

The Disclosure Statement details how the debtor intends to treat DSB's debt, which it lists at $1,508,965.00.[10] It places the value of DSB's collateral at $3,450,000.00. The Disclosure Statement proposes to make interest only payments of $5,659.00 to DSB for the first 30 months of the plan, with interest being set at a fixed rate of 4.5% per annum. In the 31st through 60th month of the plan, the payments to DSB would increase to $7,645.00, representing the monthly payment for the balance, amortized over 30 years. A final, balloon payment of $1,443,771.00 would be paid to DSB at the conclusion of the plan.

The Disclosure Statement also proposes to restructure FNBA's loan, but offers a fixed rate of 7% on this obligation.[11] General unsecured creditors are projected to receive full payment of their claims, without interest, by receiving quarterly payments over the life of the plan and a final, balloon payment at the plan's completion.

### III.  THE EVIDENTIARY HEARING.

At the evidentiary hearing on the motions to dismiss, Aaron Pletnikoff, the chief lending officer for DSB, testified that the debtor had defaulted on the loan in June 2015, and that the current balance owed was approximately $1,700,000.00. Mr. Pletnikoff testified that the monthly payments on the loan were roughly $21,000.00, and DSB had not received any payments on the loan since October 2015. He explained that DSB's security interests extended to the rents derived from the realty subject to its deeds of trust, and was clear that DSB did not

---

[10] The Disclosure Statement states that DSB is "allegedly secured" by a deed of trust, and challenges the scope of DSB's security interest, particularly with respect to Lot 26. The basis for challenging the validity of DSB's secured claim is not stated, but the Disclosure Statement represents that the debtor is in the process of filing an adversary proceeding against DSB to determine this issue. *See* ECF No. 42 at 28, 32. The debtor has not yet filed such an adversary proceeding.

[11] DSB contends the higher fixed rate of interest to FNBA is evidence of unfair treatment. However, both the FNBA and DSB loans provide for a variable interest rate, and the current variable rates for each loan match the fixed rates stated in the Disclosure Statement. *See* DSB's Proof of Claim No. 4-1, at 2, and FNBA's Proof of Claim No. 5-1, at 2, filed in Bowers #1, Main Case No. 15-00395-GS.

consent to the debtor's use of its cash collateral.  Mr. Pletnikoff produced a May 12, 2016 letter from DSB's counsel to the debtor's counsel that specifically stated this position.  However, the letter offered terms on which DSB might consent to use of its cash collateral.  DSB would require the debtor to deposit its cash collateral into a monitored DSB account, or alternatively, an account maintained by an independent property manager, and that the funds could only be used to pay vendors providing specific services with respect to DSB's real property collateral. Mr. Pletnikoff stated that nothing ever came of its offer.

Gerald Bowers, the debtor's sole member and manager, testified as to the debtor's efforts to reorganize.  He stated that the debtor is currently collecting $14,500.00 in monthly rents from DSB's collateral and $6,000.00 per month in rents from FNBA's collateral.  He acknowledged that no written lease between the debtor and Yukon Maxi Storage, his wholly owned entity, existed for this entity's use of Lot 26.  He also testified that, currently, the total operating expenses for all of the debtor's commercial properties averaged $15,000.00 per month.

Mr. Bowers went into some detail regarding the debtor's efforts to obtain new tenants. He believes these efforts have been frustrated by what he characterized as DSB's aggressive activities.  He further testified regarding his belief as to the value of DSB's collateral.  He contends the debtor's property at 2173 University Avenue should be valued anywhere between $800,000.00 to $900,000.00.  He also believes that 2175 University Avenue was worth $4.2 million.  When asked for his basis as to this valuation, Mr. Bowers answered that he was relying on a 2006 appraisal of the property, and that, in his mind, the property was worth at least $100.00 per square foot.  Given the 30,000 square feet available at 2175 University Avenue, he believes that this property should be worth at least that.  When pressed on the issue, he conceded that the 2006 appraisal of 2175 University Avenue was premised upon an assumption of full occupancy, which is not presently the case.

## ANALYSIS

Section 1112(b)(1) requires the court to convert or dismiss a chapter 11 proceeding upon a showing of cause. "The bankruptcy court has broad discretion to determine what constitutes 'cause' under § 1112(b)."[12]  The moving party "bears the burden of establishing by a preponderance of the evidence that cause exists."[13]

While the term "cause" is not specifically defined, § 1112(b)(4) provides a non-exclusive list of factors considered cause for conversion or dismissal.  In this instance, the movants rely on the following subsections of § 1112(b)(4) to find cause:  substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, under subsection (b)(4)(A); the debtor's unauthorized use of cash collateral substantially harmful to one or more creditors under subsection (b)(4)(D); and the debtor's unexcused failure to timely satisfy any filing or reporting requirements under subsection (b)(4)(F).[14]  DSB also asserts bad faith on the debtor's part as a basis for dismissal.  Although bad faith is not listed as a ground to find cause under § 1112(b)(4), it is a well recognized basis for conversion or dismissal under § 1112(b)(2).[15]

Upon a finding of cause, the court is required to dismiss or convert the case, whichever is in the best interests of the creditors and the estate, unless it "finds and specifically identifies

---

[12] *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 614 (B.A.P. 9th Cir. 2014).

[13] *Id.* (citing *StellarOne Bank v. Lakewatch LLC (In re Park)*, 436 B.R. 811, 815 (Bankr. W.D. Va. 2010).

[14] The UST also references § 1124(b)(4)(E), "failure to comply with an order of the court."  Its motion notes that the debtor failed to comply with court orders in Bowers #1, specifically, orders directing the debtor to appear for a Rule 2004 examination and an interim cash collateral order, but does say that the debtor has violated any orders in the instant case.

[15] *Marsch v. Marsch (In re Marsch),* 36 F.3d 825, 828 (9th Cir. 1994) ("Although section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal.")

unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate."[16]  Even then, to avoid conversion or dismissal, the debtor must prove that there is a reasonable likelihood that a plan will be confirmed within a reasonable time, and that it has a reasonable justification for, and can cure within a reasonable time, any act or omission that constitutes a basis for conversion or dismissal.[17]

## I.      CAUSE FOR DISMISSAL OR CONVERSION OF THE CASE.

### A.      Bad Faith Filing.

In the Ninth Circuit, the test for determining bad faith has been defined as "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."[18]  The good faith/bad faith determination "depends on an amalgam of factors and not upon a specific fact."[19]  For this reason, a chapter 11 petition filed to forestall execution or foreclosure is not necessarily done in bad faith, if the creditor's activities would "severely disrupt the debtor's business," and the debtor has a reasonable chance of successful reorganization.[20]  In determining bad faith, courts look to the totality of the circumstances surrounding the case in an effort to ascertain whether the debtor has filed the bankruptcy for "tactical reasons unrelated reorganization."[21]

---

[16] 11 U.S.C. § 1112(b)(2).

[17] 11 U.S.C. § 1112(b)(2)(A), (B).

[18]  *In re Marsch*, 36 F.3d at 828.

[19] *Id.* (quoting *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986)).

[20] *See, e.g., In re Marsch*, 36 F.3d at 828 ("Several bankruptcy courts have held that a debtor may use a Chapter 11 petition to avoid posting an appeal bond if satisfaction of the judgment would severely disrupt the debtor's business.").

[21] *Id.* at 828.

To support its contention as to bad faith, DSB points to the timing of the debtor's two bankruptcy filings, the debtor's untimely filing of its schedules and statements, and the debtor's failure to promptly address the use of its cash collateral. DSB draws a comparison between the debtor and those in *In re Spectee Group, Inc.*,[22] and *In re Gel, LLC*.[23] In each of these cases, the courts dismissed the debtor's second bankruptcy filing on the grounds of bad faith.

In *Spectee*, the corporate debtor owned a leasehold interest and filed bankruptcy to avoid imminent foreclosure. In the original case, the bankruptcy court concluded that the debtor could not confirm a plan of reorganization *as a matter of law* and dismissed the bankruptcy. The debtor then transferred the lease to a newly formed entity, who filed the second bankruptcy shortly before the creditor's rescheduled foreclosure. The bankruptcy court easily found that second filing was "obviously just a subte[r]fuge to circumvent the dismissal of the prior case."[24]

A similar fact pattern is found in *GEL, LLC*. In that case, the same debtor filed a second bankruptcy petition shortly after its original bankruptcy case was dismissed. The debtor had no means to reorganize, as it had neither employees nor income. It filed its second petition in another district. After the second filing was transferred back to the original court for lack of venue, the court found that the bankruptcy was filed not for the purpose of reorganization, but rather "in an effort to gain the upper hand in state court litigation, with a demonstrable absence of any possibility of confirming a chapter 11 plan."[25]

---

[22] 185 B.R. 146 (Bankr. S.D.N.Y. 1995).

[23] 495 B.R. 240 (Bankr. E.D.N.Y. 2012).

[24] *In re Spectee Group, Inc*, 185 B.R. at 151. The court also noted that a later filed plan of reorganization was not proposed in good faith, and "that the Spectee transfer served no legitimate business purpose." *Id*. at 153.

[25] *In re GEL, LLC*, 495 B.R. at 248.

10

The debtor's situation parallels those found in *Spectee* and *GEL, LLC* only in that each debtor owned real property, and filed two successive bankruptcies to stop foreclosures. However, neither the filing of two successive bankruptcies, nor filing bankruptcy to prevent foreclosure, is per se evidence of bad faith.  Indeed, to make such a finding would be at odds with the directive that courts look at the totality of circumstances in determining bad faith.  The court must examine an amalgam of factors to determine whether the debtor seeks to *unreasonably* deter and harass its creditors.  Here, there is no evidence of the improper maneuvering that was found in *Spectee* or *GEL, LLC*.  The debtor has not engaged in subterfuge by transferring its assets to a new debtor, nor did it file its second petition in a different district. Moreover, unlike *GEL, LLC*, the debtor has more than one asset, and a regular income stream, consisting of tenant rents.  Further, it appears the debtor's real property may be worth substantially more than DSB's secured debt.  The debtor's situation is also materially distinguishable from that in *Spectee*, because in Bowers #1 there was no determination that the debtor could not confirm a plan as a matter of law.  Rather, Bowers #1 was dismissed due to the debtor's failure to comply with court orders and requirements of the Bankruptcy Code.[26]

This is not to say that successive bankruptcy filings timed to prevent foreclosure should not be closely scrutinized.  However, the court must evaluate the entirety of the debtor's circumstances  to determine whether it has filed chapter 11 for a legitimate purpose, e.g., to attempt to reorganize a valid business, or primarily for the improper purpose of delaying foreclosure or harassing creditors.

---

[26] The debtor's flaws in performance in Bowers #1 were in large part attributable to the deterioration of its attorney-client relationship.  The court noted this in its dismissal order.  *See* Order Granting Mot. to Dismiss, ECF No. 121, at 9, filed in Bowers #1, Main Case No. 15-00395-GS.

11

DSB urges the court to find that the debtor's bankruptcy filings were made as part of a scheme to delay, hinder, or defraud creditors, and also seeks *in rem* relief from stay under § 362(d)(4) on this basis. Yet, again, the cases it has cited to support this position are distinguishable. *In re Montalvo*[27] involved "six strategically timed bankruptcy filings" made by the debtor and other family members, for the purpose of thwarting eviction proceedings by a mortgage lender who had acquired title to the subject real property through foreclosure.[28] Six successive chapter 13 petitions were filed between June 25, 2007, and April 22, 2009. It was clear that the debtor and other family members who filed these petitions had no intention of prosecuting the chapter 13 cases; no chapter 13 plans were filed and all were dismissed for failure to file required documents, failure to attend § 341 meetings, or failure to pay certain fees. In addition to the history of serial filings, the court found that the "uncontroverted record" presented the "lack of any good faith prosecution" in any of the cases, and found that the sixth petition "was part of a scheme of Debtor to delay, hinder, and defraud HSBC."[29]

Similarly, *In re Hymes*,[30] cited by DSB in its Motion for Relief From Stay, presented a lengthy history of meritless litigation by the debtors to defeat a particular creditor. The facts of that case were egregious. The debtors' maneuvers spanned almost two decades, before not only the bankruptcy court, but the United States District Court, in an effort to thwart the United States' efforts to assess and collect federal income taxes.[31] This court found that "the Hymes have no inclination to make payments to the United States on their tax debt," and that their third

---

[27] 416 B.R. 381 (E.D.N.Y. 2009).

[28] *Id.* at 387.

[29] *Id.*

[30] 2013 WL 653060 (Bankr. D. Alaska Feb. 20, 2013).

[31] The exhaustive history of the Hymes' efforts to defeat collection will not be detailed here.

bankruptcy was "but one more chapter in [their] longstanding dispute . . . that began with their fraudulent transfer of [their home] and omission of the tax debt in their 1990 bankruptcy."[32] The Hymes' intentions to evade and defeat, rather than deal with, their tax debt was apparent not only in their bankruptcy cases, but also in the District Court tax litigation sandwiched between these filings.

There is simply no parallel between the Hymes' case and the instant one. The debtor has acknowledged DSB's claim in both of its bankruptcies. There is no history of contentious litigation outside of the two bankruptcies, although DSB has obtained a default judgment against Mr. Bowers personally. The debtor's failure to promptly seek permission to use DSB's cash collateral is problematic, but this factor alone does not establish a "scheme" as required under § 362(d)(4).

Considering the record in both the instant case and Bowers #1, the court finds that the debtor's purpose in filing each chapter 11 case was for a legitimate purpose. This debtor has income and property with equity. In Bowers #1, all parties generally recognized that this debtor was a good candidate for reorganization, based upon its existing income and the general value of its assets. Bowers #1 was dismissed for failures and omissions attributable in large part to the breakdown of the attorney-client relationship, rather than on a substantive determination that the debtor could not reorganize. The court finds that there is a sufficient possibility of reorganization, in some form, to support the legitimacy of the debtor's second chapter 11 filing. Considering the entire amalgam of factors at play in this case, the court finds the debtor's efforts in this case, albeit far from perfect, weigh heavily against a finding of bad faith.

---

[32] *Id.* at *6.

13

### B.    Unauthorized Use of Cash Collateral Causing Substantial Harm.

"The use of cash collateral without court authorization or the creditor's consent can have harsh consequences, including the dismissal of the case or the granting of relief from the automatic stay."[33]   During the evidentiary hearing, the court found that the debtor had used DSB's cash collateral without its consent or court approval.  The debtor admits that it has done so to pay ongoing operating expenses, and an exhibit to its cash collateral motion generally supports this assertion.[34]

A finding that the debtor used DSB's collateral without authorization is not, by itself, sufficient to find cause for dismissal or conversion under § 1112(b)(2)(4)(D).  This subsection further requires that the unauthorized use of cash collateral must have substantially harmed at least one creditor.  Neither party has directly addressed this issue, although DSB points to the debtor's undocumented use of cash collateral funds that were released in Bowers #1 as part of the prior cash collateral agreement, noting that the debtor deposited and commingled these funds and others in its FNBA bank account.[35]

In one of the few cases to consider the requirement of substantial harm, the court in *In re Visicon Shareholders Trust* observed that "substantial" is defined to mean "considerable in

---

[33] *In re Madawaska Hardscape Products, Inc.*, 476 B.R. 200, 214 (Bankr. D. S.C. 2012); *See also Pena v. Mafredo*, 2013 WL 4817581 (E.D. Cal. Sept. 6, 2013 ).

[34] *See* Ex. 1 to Bowers Decl., ECF No. 55-2 ("Accounting for Necessary Expenditure of Cash Collateral from 5/6/16 through 6/23/16").

[35] Dec'l of Aaron Pletnikoff, ECF No. 18 ¶5.  The debtor's monthly operating reports in Bowers #1 reflect various smaller deposits attibutable to "YMS," which the court assumes is Yukon Maxi Storage. *See*, e.g., ECF No. 110, at 4, filed in Bowers #1, Main Case No. 15-00395-GS.  No accounting has ever been provided regarding the amounts generated by Yukon Maxi Storage, or paid to the debtor.  The court does note, however, that the same operating report appears to designate expenses by property.

14

importance, value, degree, amount or extent."[36]  The debtor in *Visicon Shareholders Trust* had

used cash collateral, in part, to improve the secured creditor's collateral, but also used it to pay

insiders' personal expenses and certain non-priority unsecured creditors "in complete derogation

of the bankruptcy scheme."[37]  Because no evidence was presented to show that the payment of

the latter expenses and claims either benefitted the estate or was otherwise justified, the court

concluded that the unauthorized use of cash collateral had harmed the secured creditor.

In *Pena v. Manfredo*,[38] the debtor owned and managed numerous residential properties

encumbered by deeds of trust.  He did not file his motion for use of cash collateral until the date

of his meeting of creditors, six weeks after his bankruptcy petition.  By then, the debtor had used

$16,000.00 in cash collateral.  The secured creditors opposed the cash collateral motion, in part

because the debtor had failed to account for the rental income and expenses as to each property.[39]

The bankruptcy court ordered conversion of the case under § 1112(b)(4)(D), finding an

unauthorized use of cash collateral that substantially harmed at least one creditor.  On appeal,

the district court affirmed.  Considering the issue of substantial harm, the court noted,

"[a]lthough some of the $16,000 went to business overhead and secured debt payment, 'there

was apparently no effort to use rent collected from a particular property to pay the deed of trust

encumbering that property.'"[40]  Also significant to the district court was the bankruptcy court's

---

[36] *In re Visicon Shareholders Trust*, 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) (quoting The American Heritage Dictionary 1376 (4th ed. 2007)).

[37] *Id.*

[38] 2013 WL 4817581 (E.D. Cal. Sept. 6, 2013).

[39] *Id.* at *2.

[40] *Id.* at *6.

15

finding that the debtor had failed to segregate the funds by property or to provide "an accounting of the precise expenditures of these funds."[41]

In the instant case, the debtor has provided a budget for income and expenses that reflects monthly income of $14,683.73 from DSB's collateral, and $6,000.00 per month from FNBA's collateral, for a combined monthly gross income of $20,683.73. The budget details monthly expenses of $15,174.50, suggesting that the debtor has sufficient income to meet its operating expenses, but not its debt service. While the debtor has segregated its income by property, it has not similarly segregated its expenses. It appears that most of the expenses are capable of allocation amongst the properties. DSB has demanded, and is entitled, to know the expenses attributable to its collateral, and whether the debtor has used, or will use, its cash collateral to pay expenses attributable to FNBA's collateral.[42]

The debtor maintains it has used the cash collateral to pay the operating expenses of the estate. DSB has indicated that such use might not be objectionable. A strict use of its cash collateral for such purposes might preclude a finding of substantial harm. However, the debtor has failed to account for the use of such funds over the two months it has operated in chapter 11, just as it did in Bowers #1. Further, the debtor has not proactively sought authority to use DSB's cash collateral. Its pending cash collateral motion was filed more than six weeks postpetition, and has yet to be noticed. Cash collateral motions are generally "first day" motions filed promptly after a chapter 11 case is initiated. The debtor's reluctance to deal effectively with the cash collateral issues presented in this case, its failure to completely and accurately account for the use of cash collateral, and its continuing refusal to segregate the monthly expenses associated

---

[41] *Id.*

[42] While this information might be found in the debtor's required monthly operating reports, the debtor has failed to timely file its operating report for May, 2016.

16

with DSB's collateral constitute substantial harm to DSB.  For these reasons, the court finds cause to convert or dismiss this case pursuant to § 1112(b)(4)(D).

### C.    Continuing Losses and the Unexcused Failure to Timely File Reports.

DSB also contends that cause to dismiss exists under § 1112(b)(4)(A) due to substantial and continuing losses from the debtor's operations.  The UST seeks to dismiss or convert for cause for the debtor's failure to timely file required reports under § 1112(b)(4)(F).  From the court's perspective, these two subsections are intertwined in this case because the debtor's failure to timely file its monthly operating report for May 2016, or to otherwise make a full and timely  accounting of its use of DSB's cash collateral, precludes the court from determining whether the debtor can actually pay its monthly operating expenses.

DSB relies heavily on the debtor's failure to make monthly payments to it since October 2015, as well as the fact that unpaid property taxes are owed to the Fairbanks North Star Borough, as evidence of substantial and continuing losses.  The debtor's projections demonstrate, however, that even with the limited tenants it currently has, its monthly income is sufficient to meet its operating expenses, even excluding revenue from Lot 26 and Yukon Maxi Storage.  There also appears to be some, if not considerable, equity in DSB's real property collateral.[43]  This apparent equity cushion leaves the court less concerned about the lack of

---

[43] The question of payment to DSB remains unresolved.  But, based on the debtor's representations and testimony, it appears there may be substantial equity in DSB's real property.  Although the court is unwilling to wholly credit Mr. Bower's unsupported and conclusory statements of valuation, it notes that DSB has not offered its opinion as to the value of the property, even though it has expended $10,000.00 for a recent appraisal.  DSB's claims filed in both the instant case and Bowers #1 are also coy on this point; they reflect DSB is fully secured, but that the value of its collateral is "disputed."  The tax assessed values of the property, provided by DSB, are $510,016.00 for 2173 University Avenue, and $2,010,692.00 for 2175 University Avenue, suggesting that DSB is oversecured by roughly $800,000.00, even ignoring the dispute concerning Lot 26.  During the course of the hearing, DSB argued that tax appraisals are not reliable indicators of value.  They are admittedly not as accurate as an appraisal, but, when considered in the context of the record at this stage of the bankruptcy, they suggest that DSB is an oversecured creditor.  As such, the court is not quite as concerned about the present lack of monthly payments to DSB.

payments to DSB than with whether the debtor can actually meet its monthly operating expenses. The debtor's monthly operating reports would shed light on this issue. However, the debtor has failed to timely file its May 2016 operating report.

The debtor's unsecured claims have grown significantly since Bowers #1, jumping from $13,381.69 to $59,618.07, adjusted to exclude property taxes.[44] In its cash collateral motion, the debtor identifies debts totaling $15,507.99, currently owed to Golden Valley Electrical Association ("GVEA"), Fairbanks Natural Gas, GCI Cable & Internet, and Sourdough Fuel, as past due critical operating expenses. Particularly worrisome is the debt owed to GVEA. As part of the cash collateral agreement in Bowers #1, DSB agreed to release cash collateral to pay a substantial balance owed to GVEA. The existence of such debts, coupled with the lack of a detailed accounting for the use of the cash collateral, call into question the debtor's ability to meet its operating expenses. Alternatively, the increased amount of the debtor's operating expense debt calls into question its assertion that it has used cash collateral to pay those expenses. To answer either question would establish cause under § 1112(b). Either the debtor is operating at a loss, or it has diverted cash collateral to expenses other than operating expenses.

Based on the present record, the court cannot say which it is. But, for purpose of determining the motions to dismiss, it suffices that the debtor has not timely provided the creditors, the UST, or the court with sufficient information to be able to answer these questions. As noted above, the debtor's May 2016 operating report might yield the answer, but this report is now overdue. Generally, the court would not place such significance on one missing monthly operating report that is less than two months delinquent. But, given the debtor's history, and its failure to precisely account for the use of all cash collateral in either in Bowers #1 or the instant

---

[44] Compare Schedules E\F, ECF No. 34.

18

case, it finds cause exists under § 1112(b)(4)(A) and (F) for conversion or dismissal. The evidence strongly suggests a substantial or continuing loss to or diminution of the estate. Further, the missing monthly operating report supports a finding of cause, due to the debtor's unexcused failure to timely satisfy any reporting requirement.

### B.    Unusual Circumstances and Likelihood that Plan will be Confirmed.

The court concludes that cause exists, under § 1112(b)(4)(A), (D) and (F), to convert or dismiss this bankruptcy. It must next determine whether unusual circumstances exist such that conversion or dismissal of the bankruptcy is not in the best interests of the creditors and estate.[45] If unusual circumstances are found, the court cannot convert or dismiss the case if the debtor establishes:

> (A)    there is a reasonable likelihood that a plan will be confirmed within the time frame established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B)    the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) –
>
> > (I)    for which there exists a reasonable justification for the act or omission; and
> >
> > (ii)    that will be cured within a reasonable period of time fixed by the court.[46]

Immediately prior to the hearing on the motions to dismiss, the debtor filed a disclosure statement that detailed the proposed treatment of its secured creditors. As to DSB, the debtor proposes to essentially pay it interest over five years with a balloon payment for the balance of roughly $1.4 million. Because the disclosure statement goes directly to the question of whether

---

[45] 11 U.S.C. § 1112(b)(2).

[46] *Id.*

19

the debtor has reasonable likelihood that a plan will be confirmed within a reasonable time, the court requested supplemental briefing from the parties regarding the sufficiency of DSB's proposed treatment. Unsurprisingly, DSB argues that it will not accept such treatment, and that a plan with these provisions cannot be confirmed over its objection.[47]  The debtor disagrees.

As alluded above, based upon the debtor's apparent income stream, its prospect of obtaining additional tenants, and the general value of its assets, the court believes it is *possible* for this debtor to propose and confirm a plan. Yet, there is nothing in the debtor's history or actions, in this case or the prior one, to suggest that this is reasonably likely to occur in a reasonable time. This is largely attributable to management's growing animosity with DSB. Indeed, the debtor's stated intent to challenge DSB's secured claim only serves to confirm this.[48]

Further, even with this possibility as to reorganization, the debtor is currently in no position to reach this goal. It can only be reached if this corporate debtor has proper representation. Its reorganization efforts in Bowers #1 were unsuccessful in large part due to the breakdown of the attorney-client relationship. In the instant bankruptcy case, the debtor is facing a loss of representation. It retained Frank Cahill, a longtime bankruptcy practitioner, whose practice has focused primarily upon consumer bankruptcies, to file the second bankruptcy. Mr. Cahill has candidly, and repeatedly, advised the court that he does not believe he is qualified to continue to represent the debtor. He took the case as a stopgap measure until the debtor could find and retain more experienced chapter 11 counsel. Towards this end, Robert Garrison, an

---

[47] *See In re Alaska Fur Gallery*, 2011 WL 4904425, at *9 (Bankr. D. Alaska Apr. 29, 2011); *In re Grogan*, 2013 WL 1788024, at *8-10 (Bankr. D. Or. Apr. 26, 2013). Again, the court is hampered from any evaluation of the balloon payment based upon the lack of any credible, detailed analysis of the value of DSB's collateral.

[48] The debtor says it intends to challenge DSB's secured interest, but has failed to either bring an adversary action, or otherwise detail the basis for such a challenge. Its dispute seems to be directed at DSB's inclusion of Lot 26 as collateral, rather than an overall challenge to the underlying secured claim.

attorney from Port Orchard, Washington, has sought to appear pro hac vice on the debtor's behalf. However, Mr. Garrison has not yet submitted a conforming application to appear pro hac vice, nor has an application to employ Mr. Garrison as DIP counsel been filed. While the court credits Mr. Cahill for his efforts, and particularly for his work with Mr. Bowers, the debtor is now facing the loss of his assistance. Mr. Cahill has filed a motion to withdraw from the debtor's representation. As a business entity, the debtor may only prosecute this bankruptcy through counsel.

The debtor's change of counsel has had some positive results over Bowers #1. While DSB accurately notes that the debtor did not timely file its schedules and statements, those documents have now been filed, and no party attacks their sufficiency. The debtor has attended its § 341 meeting of creditors. It has also filed a disclosure statement and plan of reorganization. These efforts indicate that the debtor is trying to comply with the requirements imposed on a chapter 11 debtor. On the other hand, the debtor failed to timely file its schedules and statements, and has yet to file its monthly operating report for May 2016, the only report that has come due to date. Tellingly, it has yet to effectively address the issue of the use of DSB's cash collateral, in large part because it remains to deposit DSB's cash collateral in a DSB account. Its motion for use of cash collateral was filed weeks after the petition, and on the eve of the hearing on the motions to dismiss. As discussed above, these failures are cause for conversion or dismissal under § 1112(b)(4)(A), (D) and (F).

To be fair, the truncated nature of this case only exacerbates these failures. But, the debtor cannot realize its goal of reorganization absent the guidance of experienced chapter 11 counsel. Given the debtor's failure to provide such information in Bowers #1, and the timing of the present case, it was incumbent upon the debtor to promptly seek authority to use DSB's cash collateral, and to account for all such use, without prompting from either the creditor or the

21

court.  It has failed to do, and offers no explanation as to why.  Nor does it suggest how it might cure this failure within a reasonable time.  Animosity towards DSB does not justify its inaction. Similarly, the debtor offers no explanation for its failure to timely file its first monthly operating report.  The impending hiatus in representation may explain these failures, in part.  However, unless and until the debtor retains experienced chapter 11 counsel, there is no reasonable expectation that it will cure these failures within a reasonable period of time.  Accordingly, the debtor cannot meet the statutory prerequisites to avoid conversion or dismissal of its bankruptcy.

### C.  Conversion or Dismissal.

Section 1112(b)(1) requires the court to consider whether conversion or dismissal is in the best interests of the creditors and estate.  DSB seeks dismissal so it may proceed with its foreclosure.  The UST is largely indifferent to the choice.

The court "has an independent obligation under § 1112 to consider what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interest of all creditors, not just the largest and most vocal creditor."[49]  In this case, the court determines conversion better serves the interest of all creditors because it will maximize the value of the estate, benefitting both the unsecured creditors and the debtor's ownership.  As discussed above, although the exact value of the debtor's assets is uncertain, they appear to have sufficient value to not only pay DSB's claim in full, but also generate a substantial dividend, if not full payment, to the unsecured creditors.

The UST has observed that this case is ripe for the appointment of a chapter 11 trustee to resolve the recurring issues with management.  But, she also noted that the amounts at issue in this case are not likely to support a chapter 11 trustee.  A chapter 7 trustee may be able to

---

[49] *In re Sullivan*, 522 B.R. at 613.

reach similar objectives within a liquidation, and will ensure that any equity in DSB's real property collateral is preserved for the benefit of all creditors.

Given the short time this case has existed, the court's decision to convert may seem extreme. However, considering the debtor's overall bankruptcy history, including Bowers #1, it is clear to the court that its animosity towards DSB cannot be channeled into productive reorganization efforts absent the guidance of experienced chapter 11 counsel. The lack of accurate accounting and the debtor's failure to effectively address the use of DSB's cash collateral cannot be overlooked. Absent a better understanding of the value of DSB's collateral, and the debtor's assets in total, the court is unwilling to forego the possibility that a chapter 7 trustee might find a way to pay the growing numbers of the debtor's unsecured creditors. Appointment of a chapter 7 trustee will provide the opportunity for a neutral evaluation and assessment of the debtor's assets while preserving the ability to maximize any opportunity for payment of the unsecured creditors. The alternative of dismissal would likely lead to DSB's prompt foreclosure of its collateral, to the detriment of the unsecured creditors. Moreover, if there is, in fact, no equity in DSB's collateral, it may seek relief from stay on this basis post-conversion.

## CONCLUSION

The debtor filed the instant chapter 11 petition in good faith. However, the debtor has failed to promptly seek permission to use DSB's cash collateral. It has been reluctant to deal effectively with the cash collateral issues present in this case, failing to fully and accurately account for the use of its rents, which include DSB's cash collateral, and refusing to segregate its monthly expenses associated with DSB's cash collateral. Its failure to account for use of the cash collateral, coupled with an increase in past due operating expenses, suggests that the debtor is either operating at a loss, or has diverted cash collateral for purposes other than to pay

operating expenses.  This is an unanswered question.  The debtor's monthly operating reports might have resolved this issue in the debtor's favor, but the initial report is now three weeks overdue.

DSB and the UST seek conversion or dismissal on account of these failures, pursuant to 11 U.S.C. § 1112(b).  The court finds cause for conversion exists under 11 U.S.C. § 1112(b)(4)(A), (D) and (F).  Having evaluated both alternatives in the context of the best interest of all creditors, the UST's Motion shall be granted and this case will be converted to chapter 7.  DSB's Motion, which seeks dismissal, shall be denied.  An order will be entered consistent with this Memorandum.

DATED this 7th day of July, 2016.

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:  Frank Cahill, Esq.
        James DeWitt, Esq.
        Michael McLaughlin, Esq.
        Thomas Buford, Esq.
        Case Manager
        SVS